THOMAS LYON, owner of a woman slave named Hannah, whose progeny are the subject of the present controversy, by his testament, after bequeathing to his wife Mary Lyon, whom he appointed one of his executors, his whole estate during her life bequeathed the three first children which Hannah should bring forth to three of his children severally, of whom Mary Frazer was one. Mary Frazer who succeeded to all the descendible property of the other two legataries, as well as to that of a fourth child, undisposed by them, made her testament, which, besides the bequest of a negro girl to Elizabeth Willis after the death of *157 her mother, contained these words: i give and bequeath unto my dear mother Mary Lyon all the remainder part of my estate real and personal during her natural life; then, after the death of my said mother, for this estate to return to William Poin-dexter.
After the death of Mary Lyon, John Lyon, the heir at law of Mary Frazer, commenced an action of detinue, in the county '"'of New-kent, against Bartholomew Dandridge, demanding the slaves in controversy from him, in whose possession they were and who had the right of William Poindexter, the parties in that action, by rule of court, submitted the controversy between them to the arbitrament, of three men, consenting that their award should be made the judgment of the court, the arbitrators, by their award, affirmed the right of Bartholomew Dandridge, and a judgment was entered accordingly.
After the deaths of John Lyon and Bartholomew Dandridge, the defendent, son and heir of the former, claiming the right, in attempting to assert which his father had failed, commenced an action of detinue against the plaintiffs, executors of the latter, in the county court of James city, for the same slaves, on the trial of the issue in this action the award and judgment before mentioned, having been destroyed by fire, could not be produced ; nor legaly authenticated, although they have been since authenticated, and a general verdict was found, and a judgment thereupon rendered, for the defendent, affirming his right to the slaves.
For an injunction to that judgement, this bill was brought.
By the court, 31 day of October, 1791.
Whether the bequest to William Poindex-ter by Mary Frazer comprehended these slaves? was made a question by the de-fendents counsil.
The words of that bequest, all the remainder part of my estate, are comprehensive of every interest not before disposed which the testatrix had ; so that, if between the bequest to Elizabeth Willis and that to Poindexter the bequest to the mother had not been inserted, the declaration of the testatrix that this estate, i. e., all the remainder part of her estate should return to William Poindexter, would have transferred to him her interest in the slaves as effectually as if they had been designated by their names.
How will the intervening bequest influence the exposition of the testament?
The defeudents counsil objected, that no estate was bequeathed to Poindexter, after the death of the mother, besides the estate which was bequeathed to the mother for her life; but these slaves could not be properly bequeathed by Mary Frazer to her mother for life, because by her husbands testament she had before a right to them for that time; and from Mary Frazers want of power to make such a bequest of the slaves to the mother, the objector concluded they were not comprehended in the bequest to the mother; and, if not in that, '*they were not comprehended in the bequest to Poindexter, but descended to the heir of Mary Frazer.
If the slaves in controversy be the three first children of Hannah and their issue, Mary Lyon perhaps had no right to the use of them for her life, otherwise than by the testament of her daughter, unless the bequests in the testament of her husband Thomas Lyon to bis three children be void, and, no! withstanding the objections-made by some to a bequest of that kind founded on the supposed inability to appoint an owner before the existence of the thing to be owned, and on considerations of humanity, this court, whose decisions must be here authorities, until they be disapproved by the wisdom of a superior tribunal, hath formerly sustained such a bequest, for these reasons;
1. The power to appoint an owner not in existence, at the time of appointment, for example, a child who shall be born twelve months, or twenty or more years, after-wards, is tolerated by law; but this cannot be less exceptionable than the power to bequeath a thing not in existence at the testators death, to bequeath to one who is not, and to bequeath that which is not, may seem absurd, because in such a bequest the right of the testator is supposed to continue after he ceaseth to be, and consequently ceaseth to have any right, until a taker shall exist, in the former instance, and until a thing to be taken, which is to be produced by some other thing, shall exist in the other instance, but they are not more absurd than testamentary successions in ordinary cases. the difference between them, namely, that the right of the legatary commenceth immediately after the death of the testator, in the ordinary case, but not until a more distant event in the other case, are unimportant in this disquisition; for the transition of a right implieth in the nature of the thing two successive events, and consequently some time must intervene, and during that time, whether it be long or short, the right of the former owner continueth.
2. The disposition attempted by such a bequest of what is not in being the law allows to be affected by this mode: a testator may bequeath his slaves to trustees, directing them, at the end of a limited term, to distribute their increase in the manner then prescribed by them, and that may be said to be the case here; for this testator appointed executors, who are trustees, although by a different name, directed to fulfil his desire to provide for his children.
3. The roman civil law, the authority of which, if not decisive, is respectable, in cases of testamentary dispositions of chat-els, allowed such bequests as this.
Instit. lib. II. tit. 20 | 7. Fa quo-que res, quae in rerum natura *non est, si modo futura est, recte legatur, veluti fructus qui in illo fundo nati erunt, aut quod ex illa ancilla natum erit.
*158 Dig. lib. XXX. 1. XXIV. quod in rerum natura adhuc non sit legari posse, v'eluti, quidquid illa ancilla peperisset, constitit.
4. No danger of a negro childs perishing by the cruelty of the mothers owner, in not allowing her time to nurse and cherish it, for the benefit of another, is to be apprehended in the cases where such bequests occur, the most frequent case is, where the testator, owning one woman slave only, and wishing to provide in the best manner he can for a needy family of children, would distribute among them the offspring which she, with kind treatment, may rear, left in the hands of his childrens mother, as in this instance, or of some friend, in whose goodness to supply the place of a parent he confides, if negro children do perish, by cruelty of those with whom their mothers live, as is supposed, it is believed to be in cases where they are hired out, or are under the direction of overseers at places far distant from the habitations of their owners.
But the slaves in controversy not appearing to be the three first children of Hannah and their issue; let the supposition be, that the contrary is true, and that Mary Lyon was entitled to them by the testament of her husband for her life; yet the objection founded on that supposition that they were not comprehended in the bequest to William Poindexter, is disallowed.' — the proposition, that no estate was bequeathed to William Poindexter, except the estate which was bequeathed to the mother for her life, if by the words bequeathed to the mother, be understood, effectualy bequeathed to the mother, in which sense they must be understood, or else from the proposition the conclusion drawn doth not follow, is not true.
Upon the words, then after the death of my mother, for this estate to return to William Poindexter, the question is, not whether by this estate she designed an estate which she had or had not bequeathed, or had or had not a power to b'equethe, to her mother for her life? but what estate she designed William Poindexter should enjoy after the death of her mother, whether she or any other had bequeathed it to her mother for life? this refers to the descriptions of the estate, whch description is all the remainder part of my estate, i. e. all that remainder after deducting the negro girl bequeathed to Elizabeth Willis; and consequently includes the slaves in controversy.
Perhaps the mind of no man, who considered this testament, desirous only to discover the meaning of it, would have entertained a doubt, before the invention of an interested party or his counsil suggested a doubt, that the testatrix intended to dispose *all her estate among three people. That intention is the type after which, if the foregoing verbal criticism be not so just as it is at present supposed to be, her testament may be moulded, so as to effectuate the intention, let her testament be thus paraphased: i give my negro girl Poll to Elizabeth Willis, after the death of my mother; and i give all the rest of my estate to my mother, during her life; and, after her death, i give this estate, that is, all the rest of my estate; except the girl given to Elizabeth Willis, to William Poindexter, this is planely her meaning. by the other exposition, according to which that only was given to William Poindexter, the use of which the testatrix had power to give to her mother for life, if these slaves were the principal part, as they probably were, if not the whole, of her estate, William Poindexter, for whom she designed the bulk, would have taken little or nothing of it, in contradiction to her meaning.
If by the true exposition of the testament, and by the plain intention of her who made it, the slaves in controversy were comprehended in the bequest to William Poindex-ter, the verdict and judgment, by which the defendent recovered them, were manifestly contrary to right.
Presumptions can not be made in favour of the verdict, because all the facts and documents, pertinent to the dispute between the parties, pretended by either of them to have existed, appear in the preceding state of the case, and by the verdict and judgement the defendent recovered slaves, to which, according to that state, the plaintiffs indubitably had the right.
No court of law can now give the redress, which they ought to have, to the plaintiffs; and, if they cannot sue for it in a court of equity, they must succumb.
Ought this to be so? ought a verdict and judgment, when the opportunity to prevent the verdict, or to set it aside, or to reverse the judgement, hath been suffered to slip unheeded, to be fate, so that their doom, however unrighteous, is irrevocable? if by a wrong decision one be injured, why should he not have redress, as well as when the injury is occasioned otherwise.
Our ' system of jurisprudence seems not' so defective as to suffer a right to redress for any injury to be without a remedy, the common law delights, if the prosopo-poeia may be allowed, in redressing injuries, by whatever causes produced, in some instances, it is restrained from granting any redress, and in others, the redress which it can grant is inadaequate, being either too much, or too little, or not early enough, in such instances, the court of equity, supplying or proportioning the remedy, or applying it in time, exer-ciseth the functions which were the ^objects of its institution, in proceeding thus, the court of equity maintains a perfect harmony with the court of common law, or is not at variance with it, aiding the party to assert, or to assert in the most convenient form, those rights which the common law either recognized, or doth not reprobate, and giving remedies which that law reluctantly withholds, and thereby contributing its part towards accomplishing the main design of both, which is the attainment of justice.
In the court of common law, the plaintiffs *159 in this case might obtain a kind of redress by prosecuting a writ of attaint against the jury for their false verdict, but this objection ought not to effect a repulse of the plaintiffs address to the court of equity ; because, if to conduct such a prosecution, of which an example is believed never to have been in Virginia, and supposed not to have been in England during the last three hundred years, would be found to be practicable, the remedy would be inadaequate in two respects: for 1, the injury to the plaintiffs, which is not complete until the execution of the defendents judgment, ought not to be complete; but the prosecution of an attaint would not impede the execution in the mean time; and 2, the defendent, if not hindered, obtaining possession of the slaves, removing them with himself, might render this remedy by attaint ineffectual: against both which this court may provide.
If for the reason before explained application to this court be not proper to obtain redress against a false verdict, it seems proper for another reason, namely, that the plaintiffs could not regularly be permitted to give evidence of the judgment upon the award, which was an important part of their defence.
Eet the injunction to stay execution of the defendents judgment be perpetual.